## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

**CHRISTOPHER S.,**[1]

      **Plaintiff,**

**v.**                                    **Case No.: 3:22-cv-00261**

**KILOLO KIJAKAZI,**
**Acting Commissioner of the**
**Social Security Administration,**

      **Defendant.**

### PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending are Plaintiff's Brief in Support of Complaint and the Commissioner's Brief in Support of Defendant's Decision, each seeking judgment in his or her respective favor. (ECF Nos. 9, 10).

---

[1] The Court lists only the first name and last initial of any non-government parties in Social Security opinions pursuant to the October 31, 2022 Standing Order in this District, which adopts the recommendation of the May 2018 Judicial Conference Committee on Court Administration and Case Management concerning privacy of personal and medical information.

For the following reasons, the undersigned **RECOMMENDS** that the Court **GRANT** Plaintiff's motion for judgment on the pleadings to the extent that it requests remand of the Commissioner's decision pursuant to sentence four of 42 U.S.C. § 405(g); **DENY** Defendant's request to affirm the decision of the Commissioner; **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this PF&R; and **DISMISS** this case, **with prejudice**, and remove it from the docket of the Court.

## I.    <u>Procedural History</u>

In March 2015, Christopher S. ("Claimant") filed for DIB and SSI, alleging a disability onset date of December 18, 2014 due to "COPD, narcolepsy, myocardial infraction EF 30%, sleep apnea, and pulmonary hypertension." (Tr. at 1248-57, 1293). After his applications were denied at the initial and reconsideration levels of review, Claimant requested an administrative hearing, which was held before the Honorable Mark Hockensmith, Administrative Law Judge (the "prior ALJ"), on November 20, 2017. (Tr. at 1033-76). By written decision dated May 4, 2018, the prior ALJ found that Claimant was not disabled as defined by the Social Security Act. (Tr. at 51-76).

After the Appeals Council denied Claimant's request for review of the prior ALJ's decision, Claimant filed a civil action in this Court seeking judicial review pursuant to 42 U.S.C. § 405(g). The Court granted Claimant's request to reverse the Commissioner's decision and remanded the matter to the SSA. (Tr. at 5323-24); *see* (Tr. at 5292-5322). On remand, the Appeals Council noted that Claimant filed subsequent DIB and SSI claims in August 2018. (Tr. at 5329). Thus, the Appeals Council ordered that the ALJ should consolidate the claims and issue a new decision, applying the prior rules on the consolidated case. (*Id.*). The remanded case was assigned to the Honorable Melinda

Wells, Administrative Law Judge (the "ALJ").

The ALJ held an administrative hearing on January 25, 2021. (Tr. at 5228-52). By written decision dated March 19, 2021, the ALJ found that Claimant was not disabled as defined by the Social Security Act. (Tr. at 5195-5227). The ALJ's decision became the final decision of the Commissioner on June 7, 2022 when the Appeals Council denied Claimant's request for review. (Tr. 4463-69).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's Complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 7, 8). Claimant filed a Brief in Support of Complaint, and the Commissioner filed a Brief in Support of Defendant's Decision. (ECF Nos. 9, 10). The time period within which Claimant could file a reply has expired. Thus, the matter is ripe for resolution.

## II.    **Claimant's Background**

Claimant was 39 years old on his alleged onset date and 46 years old on the date of the ALJ's decision. (Tr. at 5213). He communicates in English, completed high school, and previously worked as a branch manager for an equipment company and as a heavy equipment operator. (Tr. at 1292, 1294, 5247).

## III.    **Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process

for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary, and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age,

education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the four functional areas of understanding, remembering, or applying information; (2) interacting with others; (3) maintaining concentration, persistence, or pace; and (4) adapting or managing oneself will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ

assesses the claimant's residual mental functional capacity. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for DIB through December 31, 2020. (Tr. at 5201, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since December 18, 2014, the alleged disability onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: coronary artery disease, chronic obstructive pulmonary disease, obesity, obstructive sleep apnea with periodic limb movement disorder, pulmonary hypertension, degenerative disc disease and joint disease of the lumbar spine, depressive disorder, and anxiety disorder. (*Id.*, Finding No. 3). The ALJ also considered Claimant's hyperlipidemia, acid reflux, fatty liver disease, kidney stones, hepatitis C, leukocytoclastic vasculitis, serum sickness, polysubstance use disorder, and narcolepsy, but found that the impairments were non-severe. (Tr. at 5201-02).

Under the third inquiry, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 5202-05, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20

CFR 404.1567(b) and 416.967(b) except he must have the ability to change positions for one to two minutes every 30 minutes while remaining on task. He can occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl. He can never climb ladders, ropes, or scaffolds. He should avoid concentrated exposure to temperature extremes, humidity, fumes, dust, gases, odors, and poor ventilation. He can never work at unprotected heights or around dangerous moving machinery. He can perform simple, routine tasks in a static work environment involving few changes in routine, no fast-paced work, or strict production quotas, which involves occasional interaction with the public, coworkers, and supervisors.

(Tr. at 5205-13, Finding No. 5).

At the fourth step, the ALJ determined that Claimant could not perform his past relevant work. (Tr. at 5213, Finding No. 6). Therefore, the ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in other substantial gainful activity. (Tr. at 5213-14, Findings 7 through 10). The ALJ considered that (1) Claimant was born in 1975 and was defined as a younger individual on the alleged disability onset date; (2) Claimant had at least a high school education; and (3) transferability of job skills was not an issue because the Medical-Vocational Rules supported a finding that Claimant was "not disabled," regardless of his transferable job skills. (Tr. at 5213-14, Findings 7 through 9). Taking into account these factors, Claimant's RFC, and the testimony of a vocational expert ("VE"), the ALJ determined that Claimant could perform other jobs that existed in significant numbers in the national economy, including work as a garment bagger, sorter, and inspector. (Tr. at 5214, Finding No. 10). Thus, the ALJ concluded that Claimant was not disabled as defined by the Social Security Act and was not entitled to benefits. (Tr. at 5215, Finding No. 11).

## IV.    **Claimant's Challenges to the Commissioner's Decision**

Claimant asserts that the Commissioner's decision is unsupported by substantial evidence because the ALJ erred at step three of the sequential evaluation and erred in

assessing his RFC, which impacted the hypothetical posed to the VE. (ECF No. 9 at 3-5). In response, the Commissioner argues that substantial evidence supports the ALJ's step three analysis, RFC finding, evaluation of the opinion evidence, and ultimate determination that Claimant was not disabled. (ECF No. 10 at 10-19).

## V.    <u>Relevant Evidence</u>

The undersigned has reviewed all of the evidence before the Court. The following evidence is most relevant to the issues in dispute.

### A. *Treatment Records*

On March 17, 2015, Claimant presented to the Emergency Department at Miami Valley Hospital complaining of dull, achy chest pain. (Tr. at 1962). His troponin[2] level was increased, and cardiology was consulted. (*Id.*). Claimant underwent a heart catheterization the following day, which showed severe left ventricular dysfunction with an ejection fraction[3] of 30 percent. (*Id.*). Claimant also displayed severe global hypokinesis. (Tr. at 1970). Claimant had a history of coronary artery disease with stenting to his left anterior descending artery (LAD), but he was not complying with the recommended medication and lifestyle modifications. (Tr. at 1949, 1962). Claimant's chest pain resolved with medication changes, and he was discharged on March 19, 2018. (Tr. at 1961-62). He was instructed not to lift over 10 pounds for one week after his heart catheterization. (Tr. at 1965). Claimant's follow-up echocardiogram on October 22, 2015 showed an ejection fraction of 50 to 55 percent. (Tr. at 2041).

---

[2] A troponin test is generally administered to diagnose and determine the severity of a suspected heart attack. *See* https://my.clevelandclinic.org/health/diagnostics/22770-troponin-test.

[3] Ejection fraction measures the heart's ability to pump oxygen-rich blood out to the body. In a healthy heart, the ejection fraction is 50% to 70%. *See* https://my.clevelandclinic.org/health/articles/16950-ejection-fraction.

Claimant saw Mukul Chandra, M.D., at Miami Valley Cardiologists as a new patient on October 30, 2015, complaining of increasing shortness of breath and chest tightness and pressure with physical activity. (Tr. at 2049-50). Dr. Chandra reviewed Claimant's active problem list, his medical history, medications, review of systems, and recent testing; a physical examination was essentially normal. (*Id.*). Dr. Chandra felt that Claimant had severe left ventricular dysfunction and his chest pain was consistent with angina. (Tr. at 2049, 2051). Later that day, Claimant presented to Miami Valley Hospital, complaining of chest pain. (Tr. at 2053). Claimant indicated that the pain had started an hour earlier, was radiating into his left jaw, was associated with mild shortness of breath, and was not alleviated with nitroglycerin. (*Id.*). An EKG was performed, which showed some changes, and he was admitted for further treatment. (Tr. at 2056-57, 2063).

The following day, Claimant's ejection fraction was normal at approximately 60 percent. (Tr. at 2080-81). Heart wall motion and thickness appeared normal; serial troponins were negative; and a stress test was normal. (Tr. at 2080). However, Claimant suffered from numerous active conditions including chest pain; non-ST elevated myocardial infarction; arteriosclerotic heart disease, status post angioplasty with stent; pulmonary hypertension; obstructive sleep apnea; acute back pain with sciatica; heavy smoking; ischemic cardiomyopathy; and morbid obesity of nearly 312 pounds. (Tr. at 2079, 2082). Claimant's repeat echocardiogram on November 10, 2015 showed an ejection fraction of 50 to 55 percent. (Tr. at 2335).

On November 19, 2015, Claimant's cardiologist, Dr. Chandra, recorded that Claimant's cardiomyopathy had resolved with normal left ventricular systolic function, and Claimant's hypertension was well controlled. (Tr. at 2328). Claimant returned to the emergency department with chest pain on November 28, 2015. (Tr. at 2264). His EKG

showed normal sinus rhythm and he was discharged in good condition. (*Id.*). Claimant's chest CT on December 1, 2015 was normal. (Tr. at 2300). He was thereafter admitted to Good Samaritan Hospital on January 24, 2016 with exertional left-sided chest pain with radiation to his left shoulder. (Tr. at 3368). His stress test on January 25, 2016 showed an ejection fraction of 54 percent, and his heart catheterization on January 27, 2016 recorded an ejection fraction of 55 percent. (*Id.*).

On February 1, 2016, Claimant presented to family medicine physician Leonardo Guimalada, M.D. Claimant continued to suffer from shortness of breath and chest pain when walking, but nitroglycerin helped. (Tr. at 2345). The chest pain that radiated into Claimant's back resolved with Protonix. (*Id.*). Almost one week later, on February 7, 2016, Claimant presented to Miami Valley Hospital after passing out. (Tr. at 3371). He was admitted for a possible seizure, but his neurology results were normal. (*Id.*). The cardiology department was consulted due to his cardiac history. (*Id.*). Claimant's EKG showed normal sinus rhythm, and his chest x-ray indicated no acute disease. (Tr. at 3347, 3427). However, Claimant's stress echocardiogram on February 11, 2016 showed fixed inferior wall defects likely from a heart attack. (Tr. at 3431). Claimant was discharged on that date with instructions to continue his cardiac medications at adjusted dosages and to wear a Holter heart monitor for two weeks. (Tr. at 3371). The Holter monitor recorded essentially normal sinus rhythm for the next 14 days with only occasional symptomatic events correlating to sinus bradycardia and tachycardia. (Tr. at 3429).

Claimant was admitted to Cabell Huntington Hospital on April 7, 2016 due to chest pain. (Tr. at 3045, 3134). His EKG reflected an abnormal rhythm with sinus tachycardia. (Tr. at 3018-19). Claimant underwent a nuclear myocardial perfusion study on April 9, 2016, which showed a large area of fixed inferior wall defect likely from a previous

myocardial infarction, but well preserved left ventricular function; his chest x-ray revealed no acute findings. (Tr. at 3022, 3034, 3137). He had no evidence of ischemia on stress testing. (Tr. at 3031). Claimant was discharged that day with strong recommendations to quit smoking and lose weight, as his issues were linked to poor lifestyle choices with poor diet, smoking, and lack of exercise leading to obesity, coronary artery disease, and obstructive sleep apnea. (Tr. at 3045).

On August 22, 2016, Claimant presented to St. Mary's Medical Center complaining of chest pain. (Tr. at 2438). He noted that he was under a lot of stress and smoked one-half pack of cigarettes per day. (*Id.*). His echocardiogram taken the following day showed an ejection fraction of 55 to 60 percent, and measurements were taken of wall thickness. (Tr. at 2464-65). Claimant had normal sinus rhythm per Lexiscan EKG, without signs of ischemia. (Tr. at 2466). A nuclear myocardial perfusion study showed left ventricular function was preserved with an estimated overall ejection fraction of 47 percent. (Tr. at 2466, 2467). Claimant's chest x-rays and CTs taken on September 16, 2016; October 7, 2016; and November 1, 2016 were unremarkable. (Tr. at 2429-30, 2437, 2564).

On November 3, 2016, Claimant underwent a left heart catheterization, which revealed 80 percent restenosis in Claimant's LAD, which was re-stented, but his left ventricular function was preserved with an ejection fraction greater than 55 percent. (Tr. at 3570). He presented to Cabell Huntington Hospital on December 26, 2016 complaining of chest pain. (Tr. at 3541). He was admitted to rule out acute coronary syndrome. (Tr. at 3548). Claimant's EKG and troponin tests were unremarkable. (*Id.*). Thus, he was discharged in the morning when his pain resolved. (*Id.*). Claimant's chest x-ray was normal on April 12, 2017, and his echocardiogram on April 13, 2017 and a heart catheterization on April 14, 2017 showed preserved ejection fraction. (Tr. at 3623, 3635,

11

3956-57).

On August 16, 2017, Claimant again presented to St. Mary's Medical Center due to chest pain. (Tr. at 4372). His stress test suggested ischemia, but his heart catheterization on August 19, 2017 showed nonobstructive coronary artery disease with patent LAD stent and an ejection fraction of 45 to 50 percent. (Tr. at 4371, 4381). He was discharged August 19, 2017 with instructions to quit all forms of tobacco. (Tr. at 4381). Claimant returned to St. Mary's Medical Center with chest pain on November 7, 2017. (Tr. at 4353). He ran out of his medications one week earlier and could not have them refilled due to insurance issues. (*Id.*). His cardiac testing, including EKG, echocardiogram, and heart catheterization were unremarkable. (*Id.*). He remained stable and in sinus rhythm; therefore, he was discharged on November 9, 2017. (*Id.*). Claimant was advised that he was in dire need of lifestyle modifications, including complete tobacco cessation, weight loss, daily exercise, and medication compliance. (Tr. at 4353).

Claimant presented to Cabell Huntington Hospital on April 16, 2018 with chest pain, again noting that he had run out of medication. (Tr. at 5873). His chest pain resolved with medication, and he was advised to restart all of his home medications. (Tr. at 5874). Claimant's stress test was negative and his left ventricular function was preserved at 59 percent. (Tr. at 5874, 6004). He was discharged on April 18, 2018. (Tr. at 5873). During follow up on November 13, 2018, Claimant continued to complain of chest pain, despite medication compliance. (Tr. at 6516).

On January 9, 2020, Claimant presented to primary care physician Benjamin Schnakenberg, M.D., at Marshall Health. (Tr. at 6777). He complained of pain and weakness. (Tr. at 6778). Claimant's thrombocytopenia and hepatitis C suggested compensated cirrhosis. (Tr. at 6783). During a subsequent cardiology appointment on

January 29, 2020, Claimant complained of chest pain and was transferred to the emergency department at St. Mary's Medical Center. (Tr. at 6552). His heart catheterization showed a patent stent, nonocclusive coronary artery disease, and mild cardiomyopathy with an ejection fraction of 45 percent. (Tr. at 6556). Claimant's medications were adjusted, and he was discharged on January 30, 2020. (Tr. at 6553). On March 12, 2020, Claimant complained of mild pressure in his chest, but the pain resolved. (Tr. at 6695).

Claimant followed up with Dr. Shnakenberg on May 15, 2020. He had significant swelling and pain in his feet likely evidencing serum sickness in the setting of vasculitis. (Tr. at 7102). While he was encouraged to stay off his feet for the time being, Dr. Shnakenberg agreed to provide three days of pain medication for Claimant to make it to his six-year-old daughter's birthday. (*Id.*). Dr. Shnakenberg reexamined Claimant on May 20, 2020 regarding cutaneous vasculitis and arthralgias diagnosed earlier that month. (Tr. at 7092). Claimant was taking steroids and dapsone. (*Id.*). His rash was maturing without new lesions and the swelling in his feet was stable, if not improved. (*Id.*). Dr. Shnakenberg diagnosed Claimant with aortic stenosis, peripheral artery disease, vasculitis, vasculitis of the skin, Henoch-Schonlein purpura, and Hepatitis C. (Tr. at 7097-98). He prescribed medications and ordered laboratory tests. (Tr. at 7098-99). On June 17, 2020, Claimant was off of prednisone and taking an increased dosage of Dapsone. (Tr. at 7079). He no longer had tremendous pitting edema with purpura on his lower leg, his feet were less painful and no longer swollen, and he was no longer using a cane. (*Id.*). Dr. Shnakenberg renewed Claimant's prescription for Dapsone. (Tr. at 7084).

Claimant transferred care to another family physician at Marshall Health, William Tyler Freeman, M.D., on July 21, 2020. (Tr. at 7068). He complained of hand and foot

pain due to vasculitis, although he was taking Dapsone and Diclofenac. (Tr. at 7068-69). Claimant stated that his symptoms were improving until he moved houses, and the extra activity caused a lot of swelling and pain in his feet and some cracking of the skin. (*Id.*). On examination, his hands and feet were purple. (*Id.*). Dr. Freeman renewed Claimant's medications. (Tr. at 7074).

On December 31, 2020, Claimant had a cardiology telehealth visit. He noted that he was diagnosed with vasculitis attributed to hepatitis C last month and was going through workup. (Tr. at 7321). During another cardiology telehealth appointment on January 6, 2021, Claimant reportedly weighed 310 pounds with a BMI of 45.01, and he continued to smoke. (Tr. at 7316-17). Nonetheless, his angina was stable and there were no significant abnormalities in his lab work. (Tr. at 7316). Claimant stated that he had three episodes of chest pain over the weekend, noting that the pain never really resolved after catheterization. (Tr. at 7315). The chest pain did not occur at rest, but upon any exertion such as ambulating and when cleaning his home. (Tr. at 7316). Claimant was compliant with medications. (*Id.*). His cardiologist adjusted his medication for chest pain. (Tr. at 7316-17).

### B. Prior Administrative Findings and Opinions

On November 17, 2014, David Rupp, M.D., stated that he examined Claimant, who needed to be placed on light duty, including not operating heavy machinery or driving, until November 24, 2014. (Tr. at 1576). The following year, on October 7, 2015, state agency psychologist, Carl Tishler, Ph.D., found insufficient evidence to evaluate Claimant's mental limitations. (Tr. at 1088, 1104).

On November 17, 2015, state agency physician, Bradley J. Lewis, M.D., assessed that Claimant could perform light exertional work with frequent climbing ramps and

stairs and crawling; occasional climbing ladders, ropes, and scaffolds, stooping, and crouching; and unlimited balancing and kneeling. (Tr. at 1089-90, 1105-06). In addition, Claimant could not tolerate concentrated exposure to extreme cold or heat, humidity, or pulmonary irritants. (Tr. at 1090-91, 1106-07). This assessment was affirmed by Stephen Sutherland, M.D., on April 11, 2016. (Tr. at 1124-26).

On May 11, 2016, orthopedist Julie Shott, M.D., evaluated Claimant for his Workers' Compensation claim relating to a back injury. Dr. Shott opined that Claimant could return to work as of May 2016 with the following restrictions: no lifting more than 10 pounds, pushing/pulling more than 20 pounds, or operating machinery, and Claimant needed to sit for 80 percent of the day with the option to change positions. (Tr. at 3482).

On May 8, 2017, psychiatrist Kenneth Fink, M.D., submitted a letter, stating that he was currently treating Claimant at St. Mary's Medical Center. Dr. Fink opined that Claimant had multiple significant medical conditions, as well as psychiatric issues, which were likely contributing to his current inability to work, and those factors should be taken into consideration regarding Claimant's back child support. (Tr. at 3498).

On May 20, 2020, Dr. Schnakenberg wrote a letter to the West Virginia Department of Health and Human Resources ("DHHR"), stating that Claimant had leukocytoclastic vasculitis, serum sickness, and a history of six myocardial infarctions. (Tr. at 7065). He assessed that Claimant should avoid all weight bearing because his immune complexes were causing arthritis in his lower extremities. *Id*. In addition, Dr. Schnakenberg stated that Claimant was on immunosuppressive medications for an extended duration and needed to self-isolate from COVID-19. (*Id*.). Dr. Schnakenberg concluded that Claimant would likely require long term disability and was unfit for five hours per week of classroom activities. (*Id*.).

In an undated DHHR form, psychiatrist Afiah Ahan, M.D., stated that his last contact with Claimant was June 1, 2020. (Tr. at 7066). Dr. Ahan noted that Claimant was diagnosed with schizoaffective disorder bipolar type and was expected to be disabled for the rest of his life. (Tr. at 7066). He opined that Claimant's employment limitations included chronic psychosis and depression/anxiety. (*Id*.).

### C. Claimant's Testimony

Claimant testified during his administrative hearing on January 25, 2021 that he was divorced and lived with his 7-year-old daughter. (Tr. at 5233). He stated that he could not work due to chest pain that he suffered two to three times per week and shortness of breath due to chronic obstructive pulmonary disease. (Tr. at 5234). Claimant further testified that he experienced lower back pain that radiated into his leg. (Tr. at 5235-36). Claimant noted that he took Dapsone for vasculitis, which suppressed his immune system. (Tr. at 5238). In terms of physical abilities, Claimant stated that he had to stop to catch his breath half-way up the stairs or after walking 25 to 30 feet. (Tr. at 5240). He could not stand for very long, noting that he experienced back pain after only five minutes. (*Id*.). Claimant further testified that he had to shift positions after sitting for 20 minutes, he could not lift "much at all," and doctors told him not to lift more than 20 pounds. (Tr. at 5241). Claimant explained that he could bathe and dress himself, but he had trouble performing housework. (Tr. at 5242). He noted that he had suffered what felt like a heart attack two weeks earlier and was going to undergo another heart catheterization and stress test. (Tr. at 5244). Claimant discussed that he was diagnosed with leukocytoclastic vasculitis in May 2020. (*Id*.). The condition was in remission, at the moment, due to immunosuppressant medication, but he stated that the symptoms were exacerbated by stress. (Tr. at 5245). Claimant testified that during vasculitis flares, he could not stand up

and walk because it was too painful to bear any weight on his feet. (*Id.*). Claimant reportedly had to call his father a few times to help him out of bed and to the restroom because of vasculitis. (*Id.*). Claimant testified that he took six immunosuppressant pills every other day, which essentially rendered him homebound. (*Id.*).

## VI.    <u>Standard of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to ensuring that the ALJ followed applicable Regulations and Rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.    <u>Discussion</u>

Claimant asserts that the Commissioner's decision is unsupported by substantial

evidence because the ALJ erred at step three of the sequential evaluation and in the RFC analysis of the medical opinions, testimony, and functional abilities.

### A. Chronic Heart Failure - Listing 4.02

Claimant argues that the ALJ did not properly consider whether his cardiac conditions satisfied listing 4.02, although the matter was previously remanded primarily for a complete discussion of that listing. (ECF No. 9 at 3). He argues that the lack of analysis precludes meaningful review and necessitates reversal or remand under *Radford v. Colvin*, 734 F.3d 288, 296 (4th Cir. 2013). (*Id.*).

A claimant should be found disabled at step three of the sequential evaluation process when his or her impairments meet or medically equal an impairment included in the Listing in Appendix 1 of 20 C.F.R. Part 404, Subpart P. The Listing describes "for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity." *See* 20 C.F.R. §§ 404.1525, 416.925. The Listing is intended to identify those individuals whose mental or physical impairments are so severe that they would be found disabled regardless of their vocational background; consequently, the criteria defining the listed impairments are set at a higher level of severity than that required to meet the statutory definition of disability. *Sullivan v. Zebley,* 493 U.S. 521, 532 (1990). Because the listed impairments presume disability, "[f]or a claimant to show that his impairment matches a [listed impairment], it must meet *all* of the specified medical criteria." *Id.* at 530. The claimant bears the burden of production and proof at this step of the disability determination process. *Grant v. Schweiker,* 699 F.2d 189, 191 (4th Cir. 1983).

In the Fourth Circuit, "where there is factual support that a listing could be met," the ALJ must consider whether the claimant's impairment meets or equals the relevant

listing. *Huntington v. Apfel*, 101 F. Supp. 2d 384, 390 (D. Md. 2000) (citing *Cook v. Heckler,* 783 F.2d 1168, 1172 (4th Cir. 1986)). "The ALJ's analysis must reflect a comparison of the symptoms, signs, and laboratory findings concerning the impairment, including any resulting functional limitations, with the corresponding criteria set forth in the relevant listing." *Id.* at 390-91; *see also Ezzell v. Berryhill*, 688 F. App'x. 199, 200 (4th Cir. 2017) ("When there is 'ample evidence in the record to support a determination' that the claimant's impairment meets or equals one of the listed impairments, the ALJ must identify 'the relevant listed impairments' and compare 'each of the listed criteria to the evidence of the claimant's symptoms.'") (citing *Cook*, 783 F.2d at 1172-73) (internal markings omitted).

As is the case throughout the sequential evaluation process, the ALJ must set forth the reasons for the step three determination. *See, e.g.*, *Radford*, 734 F. 3d at 295 ("A necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling.") (citing *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984)). An ALJ's explanation is insufficient if it only states that the ALJ considered the listing of impairments and offers nothing to reveal *why* the ALJ made his or her determination. *Fox v. Colvin*, 632 F. App'x 750, 755 (4th Cir. 2015) ("Our circuit precedent makes clear that it is not our role to speculate as to how the ALJ applied the law to its findings or to hypothesize the ALJ's justifications that would perhaps find support in the record."). Likewise, it is generally unacceptable for an ALJ to summarily conclude that a claimant does not have an impairment or combination of impairments that meets a listing; the ALJ's decision must include a discussion that applies the pertinent legal requirements of the listing to the record evidence. *Radford*, 734 F.3d at 295. While an "ALJ is not required to explicitly identify and discuss every possible listing", the ALJ "is compelled to provide

a coherent basis for [the] Step Three determination." *Ezzell*, 688 F. App'x at 200 (citation omitted).

In *Radford*, the Fourth Circuit found that an ALJ's step three analysis was "devoid of reasoning" and the ALJ's summary conclusion that the claimant did not meet a listing made is impossible for a reviewing court to evaluate whether substantial evidence supported the ALJ's findings. *Radford*, 734 F.3d at 295. The Fourth Circuit noted that a full explanation by the ALJ was particularly important in Radford's case because the medical record included a fair amount of evidence supportive of his claim; in fact, the record contained five years of medical examinations and probative evidence strongly suggesting that Radford met or equaled the relevant listing. *Id*. Similarly, in *Fox*, the Fourth Circuit found that the ALJ failed to explain the step three finding despite inconsistent evidence in the file, including a treating physician's numerous statements about the claimant's severe limitations, which possibly supported a finding that the claimant met the relevant listing. *Fox*, 632 F. App'x at 755 (4th Cir. 2015).

Despite the admonitions of the Fourth Circuit in *Radford* and *Fox* regarding an ALJ's duty of explanation at step three, "if the ALJ's opinion read as a whole provides substantial evidence to support the ALJ's decision at step three, such evidence may provide a basis for upholding the ALJ's determination." *McDaniel v. Colvin*, No. 2:14-CV-28157, 2016 WL 1271509, at *4 (S.D.W. Va. Mar. 31, 2016) (quoting *Smith v. Astrue*, 457 Fed. App'x. 326, 328 (4th Cir. 2011) ("Reading the ALJ's decision as a whole, substantial evidence supports the finding at step three of the sequential evaluation process as the ALJ's analysis at subsequent steps of the evaluation are inconsistent with meeting [the listing].")). Indeed, "the ALJ need only review medical evidence once in his opinion." *Id*. at *4 (quoting *McCartney v. Apfel*, 28 Fed. App'x. 277, 279 (4th Cir. 2002)). Ultimately,

"[a] cursory explanation in step three is satisfactory so long as the decision as a whole demonstrates that the ALJ considered the relevant evidence of record and there is substantial evidence to support the conclusion." *Id.* (citing *Smith*, 457 Fed. App'x. at 328). Simply put, the written decision must demonstrate that the ALJ adequately performed all of the key tasks required by the sequential disability evaluation process. When the record includes conflicting evidence, or facts suggesting that the claimant might meet a listing, the ALJ's discussion is particularly important. Yet, "[i]f the court need not look beyond the ALJ's opinion to find substantial evidence supporting the ALJ's step-three determination, the ALJ's decision may be affirmed." *Marcum v. Berryhill*, No. CV 16-2297, 2017 WL 1095068, at *4 (S.D.W. Va. Mar. 23, 2017).

Claimant's challenge concerns listing 4.02, which provided the following at the time of the ALJ's decision:

> 4.02 Chronic heart failure while on a regimen of prescribed treatment, with symptoms and signs described in 4.00D2. The required level of severity for this impairment is met when the requirements in both A and B are satisfied.
>
> A. Medically documented presence of one of the following:
>
> 1. Systolic failure (see 4.00D1a(i)), with left ventricular end diastolic dimensions greater than 6.0 cm or ejection fraction of 30 percent or less during a period of stability (not during an episode of acute heart failure); or
>
> 2. Diastolic failure (see 4.00D1a(ii)), with left ventricular posterior wall plus septal thickness totaling 2.5 cm or greater on imaging, with an enlarged left atrium greater than or equal to 4.5 cm, with normal or elevated ejection fraction during a period of stability (not during an episode of acute heart failure); AND
>
> B. Resulting in one of the following:
>
> 1. Persistent symptoms of heart failure which very seriously limit the ability to independently initiate, sustain, or complete activities of daily living in an individual for whom an MC, preferably one experienced in the care of patients with cardiovascular disease, has concluded that the performance of an exercise test would present a significant risk to the individual; or

2. Three or more separate episodes of acute congestive heart failure within a consecutive 12–month period (see 4.00A3e), with evidence of fluid retention (see 4.00D2b(ii)) from clinical and imaging assessments at the time of the episodes, requiring acute extended physician intervention such as hospitalization or emergency room treatment for 12 hours or more, separated by periods of stabilization (see 4.00D4c); or

3. Inability to perform on an exercise tolerance test at a workload equivalent to 5 METs or less due to:
a. Dyspnea, fatigue, palpitations, or chest discomfort; or
b. Three or more consecutive premature ventricular contractions (ventricular tachycardia), or increasing frequency of ventricular ectopy with at least 6 premature ventricular contractions per minute; or
c. Decrease of 10 mm Hg or more in systolic pressure below the baseline systolic blood pressure or the preceding systolic pressure measured during exercise (see 4.00D4d) due to left ventricular dysfunction, despite an increase in workload; or
d. Signs attributable to inadequate cerebral perfusion, such as ataxic gait or mental confusion.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 4.02 (Effective May 21, 2020 to Apr. 1, 2021).

In this case, the ALJ simply stated that there was no evidence of chronic heart failure and that Claimant did not meet or equal listing 4.02. (Tr. at 5203). The ALJ cited swaths of medical exhibits in support of that finding, but the ALJ did not identify any specific medical findings that supported her analysis, discuss the listing requirements, or compare any of the evidence to the listing requirements. (*Id.*). The absence of discussion is especially curious given the fact that this matter was remanded, in part, because the ALJ did not discuss listing 4.02. (Tr. at 5312-14). Moreover, the ALJ's statement is not entirely accurate, as there is evidence of "chronic heart failure" as defined in the relevant listing. The listing for the cardiovascular system describes chronic heart failure as "the inability of the heart to pump enough oxygenated blood to body tissues" which is characterized, in part, "by signs and symptoms of limited cardiac output." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 4.00(D). The Court previously explained that, while the

22

Commissioner's ultimate finding that Claimant does not satisfy the listing may be correct, the evidence warranted specific discussion of the listing. (Tr. at 5312-14). The Court cited Claimant's March 2015 heart catheterization indicating an ejection fraction of 30 percent, numerous emergency room visits and hospitalizations for chest pain, and stenosis of his LAD that that required re-stenting. (Tr. at 5313). The Court unambiguously stated that "the ALJ should have addressed Listing 4.02, even to explain that it was not satisfied" because "where, as here, the record indicates that a claimant's condition may satisfy the criteria of a listed impairment, the ALJ should at least discuss why it does not." (Tr. at 5313).

The undersigned restates that the ALJ should have discussed listing 4.02 because there was sufficient conflicting evidence in the record regarding whether the listing was satisfied, and it obligated the ALJ to articulate her analysis. (Tr. at 5312-14). Claimant had a long history of chest pain, abnormal cardiac findings, and shortness of breath, and he required significant treatment for cardiac-related symptoms, including multiple catheterizations, stenting, and medications. While the undersigned does not opine that the listing was met or equaled, it is clear under these facts and the prior remand that an explanation of the listing was required. The Commissioner indicates that the ALJ supplied the necessary explanation by stating that she considered listing 4.02 and also discussed listing 4.04, which pertains to coronary artery disease. (ECF No. 10 at 12). The Commissioner notes that the ALJ mentioned that, although Claimant underwent several heart catheterizations, they were amenable to revascularization, and Claimant's stress test results and performance of daily activities did not satisfy the listing. (Tr. at 5203).

However, while the ALJ's discussion of listing 4.04 touched on some of the listing 4.02 criteria it did not fully explain why Claimant did not satisfy listing 4.02. The criteria

23

of the listings are not identical. For instance, listing 4.02 can be satisfied in various ways, such as by offering evidence of an ejection fraction of 30 percent or less during a period of stability resulting in three or more episodes of acute congestive heart failure within a consecutive 12-month period requiring acute extended intervention such as hospitalization or emergency room treatment for 12 hours or more separated by periods of stabilization. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 4.02. The ALJ did not explain why those, or other, listing criteria were not satisfied. The record is replete with evidence regarding Claimant's cardiac symptoms, evaluations, testing, measurements, laboratory reports, imaging, diagnoses, and treatment. While the Court can certainly piece together the evidence to determine whether or not listing 4.02 was met or equaled, it cannot do so without improperly performing the analysis that should have been done by the ALJ. Simply referencing exhibits without explaining their significance is not sufficient to constitute an analysis.

The ALJ acknowledged in the RFC discussion that Claimant's March 2015 "cardiac catheterization showed ischemic cardiomyopathy with a stable ejection fraction of 30%." (Tr. at 5207). The ALJ did not examine this evidence at all in the step three analysis, although it potentially satisfied listing 4.02(A)(1). The ALJ may have determined that the test result did not satisfy the listing because Claimant was not taking his medications at the time and/or because subsequent test results indicated a higher ejection fraction. Alternatively, the ALJ might have concluded that, although the 30 percent ejection fraction satisfied the listing, Claimant did not establish the additional criteria of the listing. In sum, the Court cannot speculate regarding the ALJ's reasoning. The ALJ simply failed to articulate any step three analysis for the Court to review. Moreover, although the ALJ cited in the RFC analysis evidence that could indicate that Claimant did not satisfy

the listing, she did not connect any of it to her step three determination or discuss it in a manner that provides clear insight into her step three finding.

For those reasons, the ALJ's step three determination lacks adequate explanation to allow for meaningful review. *See Fox*, 632 F. App'x at 755 ("In short, the ALJ did not apply findings to the disability listing. Rather, the ALJ engaged in the same conclusory analysis that we found to be unacceptable in *Radford* […] in this case, the ALJ's analysis was likewise perfunctory and offered nothing to reveal *why* he was making his decision. Nor was there any specific application of the pertinent legal requirements to the record evidence. As a result, the ALJ's findings lack the necessary predicate for us to engage in review.") (citation and internal markings omitted). Therefore, the undersigned **FINDS** that the decision is not supported by substantial evidence and the Commissioner's decision should be reversed and the matter remanded to the ALJ to reconsider or elaborate upon the step three analysis of listing 4.02.

### B. *Medical Opinions*

Claimant further contends that the ALJ neglected to consider and discuss the six regulatory factors when assigning weight to the opinion evidence from his treating sources, which Claimant states *per se* requires remand under *Dowling v. Comm'r of Soc. Sec. Admin.*, 986 F.3d 377 (4th Cir. 2021). (ECF No. 9 at 4). Claimant's applications were protectively filed in 2015 before the treating physician rule was eliminated.[4] Thus, the ALJ was obligated to give special deference to certain medical opinions in the file, particularly opinions from Claimant's treating physicians. The ALJ was required to consider the medical opinions in the case record together with the rest of the relevant evidence that

---

[4] The special deference afforded to the opinion of a treating physician, often called the "treating physician rule," was eliminated for claims filed on or after March 27, 2017. 20 C.F.R. §§ 404.1520c, § 416.920c; *Rescission of Soc. Sec. Rulings 96-2p, 96-5p, & 06-3p*, 2017 WL 3928298 (S.S.A. Mar. 27, 2017).

the ALJ received. 20 C.F.R. §§ 404.1527(b), 416.927(b). Medical opinions were defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* §§ 404.1527(a)(2), 416.927(a)(2).

The ALJ was obligated under the former regulations to allocate more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* §§ 404.1527(c)(1), 416.927(c)(1). The regulations further specified that the ALJ should accord even greater weight to the opinion of a treating physician because that physician was usually most able to provide a detailed, longitudinal picture of a claimant's alleged disability. *Id.* §§ 404.1527(c)(2), 416.927(c)(2). In fact, the ALJ was required to give a treating physician's opinion controlling weight when the opinion was well supported by medically acceptable clinical and laboratory diagnostic techniques and was not inconsistent with other substantial evidence. *Id.*

As particularly relevant, here, if the ALJ determined that a treating physician's opinion was not entitled to controlling weight, the ALJ was required to analyze and weigh all of the medical opinions of record, taking into account certain factors listed in 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6).[5] The ALJ was obligated to explain the reasons for the weight given to the opinions. *Id.* ALJs were advised to "remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial

---

[5] The factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors bearing on the weight of the opinion.

26

evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected … In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *4.

In appropriate circumstances, an ALJ could reject a treating physician's opinion in whole or in part in favor of a conflicting opinion by a non-treating source, such as when the non-treating source's opinion was well-supported by evidence and explanation, more consistent with the record as a whole, and offered by a source with specialization in the subject matter of the opinion. *See Brown v. Commissioner of Soc. Sec.,* 873 F.3d 251, 268 (4th Cir. 2017). Ultimately, it was the responsibility of the ALJ, not the Court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.

Medical source statements on issues reserved to the Commissioner were treated differently than other medical source opinions. SSR 96-5p, 1996 WL 374183. In both the regulations and SSR 96-5p, the SSA explained that "some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability," including the following:

    1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;

    2. What an individual's RFC is;

    3. Whether an individual's RFC prevents him or her from doing past relevant work;

    4. How the vocational factors of age, education, and work experience apply;

and

5. Whether an individual is "disabled" under the Act.

*Id.* at \*2. "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." *Id.* Consequently, a medical source statement on an issue reserved to the Commissioner is never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." *Id.* at \*2. Still, those opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.* at \*3.

Approximately two months before the ALJ's decision under review, the Fourth Circuit issued its decision in *Dowling*, which emphasized the ALJ's duty of explanation when not affording a treating physician's opinion controlling weight. As stated by the Fourth Circuit, if the ALJ did not give controlling weight to a treating physician's opinion, the ALJ must consider each of the regulatory factors to determine how much weight to give to the opinion, including the (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability (such as the extent to which the treating source presents relevant evidence to support the medical opinion), (4) consistency of the opinion with other evidence in the record, (5) the extent to which the treating physician is a specialist opining as to issues related to his or her specialty, and (6) other factors which tend to support or contradict the opinion. *Dowling*, 986 F.3d at 384–85.

In *Dowling*, the Fourth Circuit concluded that the ALJ erred in only discussing two of the regulatory factors of consistency and supportability without any indication that the ALJ meaningfully considered *each* of the factors before deciding how much weight to give the treating opinion. *Id.* at 385-86. The Court discussed that the ALJ's error necessitated remand because two of the factors ignored by the ALJ in evaluating the treating opinion concerning the length, frequency, nature, and extent of the claimant's treatment relationship with the treating physician appeared to cut in the claimant's favor. *Id.* at 386. The Court noted that the opinion was rendered by the claimant's family physician who regularly treated the claimant at least every few months for approximately five years. *Id.* Thus, the Fourth Circuit noted that through those frequent appointments, the physician surely obtained a longitudinal picture of the claimant's impairments. *Id.* (citation omitted). 20 C.F.R. § 404.1527(c)(2)(i). The Court explained that, if the ALJ properly considered the treatment relationship, he may not have been so quick to reject the medical opinion. *Id.* That was significant because, if the ALJ had accorded greater weight to the physician's opinion that the claimant was incapable of sitting for even two hours total in an eight-hour working day and that she frequently experienced pain so severe that it interfered with her attention and concentration, it reasonably could have altered the ALJ's conclusion that the claimant was capable of performing sedentary work. *Id.*

In this case, the ALJ claimed that she considered the opinion evidence in accordance with the requirements of 20 C.F.R. §§ 404.1527, 416.927. (Tr. at 5205). The ALJ stated that she gave little weight to Dr. Schnakenberg's May 2020 opinion that Claimant was to avoid all weight bearing of his lower extremities and was on immunosuppressive medication for an extended duration and needed to self-isolate from COVID-19. (Tr. at 5213). The ALJ stated that there was no evidence that Claimant needed

to avoid all weight bearing. (*Id.*). The ALJ further explained that, although Claimant experienced vasculitis in April 2020, he was treated with steroids and began treatment for hepatitis C, and no lower extremity abnormality due to vasculitis was reported upon subsequent examination in January 2021. (*Id.*). Finally, the ALJ cited that Claimant stated that he could walk around the house to perform chores, his social limitations due to COVID-19 were not relevant to determining his RFC, and the issue of whether Claimant is disabled is reserved to the Commissioner. (*Id.*).

Although the ALJ stated that she considered Dr. Schnakenberg's opinion in accordance with the applicable regulations, she very clearly did not. First, the ALJ was required to analyze whether Dr. Schnakenberg's opinion, such as the statement that Claimant could tolerate no weight bearing, was entitled to controlling weight. The ALJ did not mention controlling weight or clearly articulate her application of this standard. Presumably, the ALJ found that the opinion was not entitled to controlling weight based on her explanation that there was no evidence that Claimant needed to avoid all weight bearing and the vasculitis that Claimant suffered in April 2020 was treated. However, the ALJ's reasoning in this respect is untenable. For instance, she relied on a January 2021 cardiology telehealth visit, stating there were no lower extremity abnormalities due to vasculitis "upon subsequent examination." (Tr. at 5213); *see* (Tr. at 7315). Claimant was not examined at that time.

Regardless, even if the ALJ properly declined to give controlling weight to the opinion, the ALJ did not proceed to consider the regulatory factors in weighing the opinion as required by SSR96-2p, 1996 WL 374188, at *4; 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6); *Dowling*, 986 F.3d 377, 384–86. As in *Dowling*, the ALJ swiftly cast aside Dr. Schnakenberg's opinion by isolating certain regulatory factors, principally

only the factor of consistency. The ALJ did not articulate any consideration of Claimant's treatment relationship with Dr. Schnakenberg, the frequency of evaluation, nature and extent of the treatment relationship, the extent to which Dr. Schnakenberg presented evidence to support his opinion, whether Dr. Schnakenberg was opining on issues within his area of specialization, or any other factors that supported or contradicted the opinion. This was precisely the narrow analysis that the Fourth Circuit cautioned against in *Dowling*.

Although some of the regulatory factors could cut against giving more weight to Dr. Schnakenberg's opinion, it is not an analysis that the Court should undertake. Even if the Court were permitted to provide such *post hoc* rationalization, the record is not so one-sided that the Court can weigh the factors for the ALJ. For instance, although Claimant may not have had a long treating relationship with Dr. Schnakenberg, he was treated at Marshall Health for many years. Furthermore, Dr. Schnakenberg was Claimant's primary care physician and diagnosed Claimant with vasculitis in May 2020, examined him, and treated him for the condition. It would appear, based on the evidence, that Dr. Schnakenberg had some degree of special knowledge as to the limitations that the condition imposed. The ALJ should have considered the factors bearing on the weight of Dr. Schnakenberg's opinion rather than outright rejecting it based on a single, and inappropriately applied, factor of consistency.

The Fourth Circuit was clear that the ALJ did not have free reign to attach whatever weight he or she saw fit, and it must be apparent from the decision that the ALJ considered each of the regulatory factors in order to discount a medical opinion from a treating physician. *Dowling*, 986 F.3d 385. Therefore, the undersigned **FINDS** that the ALJ's evaluation of the opinion evidence is not supported by substantial evidence and the

matter should additionally be remanded for the ALJ to reconsider or elaborate upon her analysis of Dr. Schnakenberg's opinion.

### C. Subjective Symptoms

Claimant next argues that the ALJ "arbitrarily ignored" his testimony that his immune system is suppressed due to medication, rending him mostly homebound. (ECF No. 9 at 3). Under the applicable Social Security rulings and regulations, an ALJ is obliged to use a two-step process when evaluating the credibility of a claimant's subjective statements regarding the effects of his or her symptoms. 20 C.F.R. §§ 404.1529, 416.929 (effective to decisions on or after March 27, 2017). First, the ALJ must consider whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. *Id.* §§ 404.1529(a), 416.929(a). In other words, "an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability." Social Security Ruling ("SSR") 16-3p, 2017 WL 5180304, at *2 (effective to decisions on or after March 28, 2016). Instead, evidence of objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" must be present in the record and must demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. §§ 404.1529(b), 416.929(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* §§ 404.1529(a), 416.929(a). If the intensity,

persistence, or severity of the symptoms cannot be established by objective medical evidence, the ALJ must consider "other evidence in the record in reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms," including a claimant's own statements. SSR 16-3p, 2017 WL 5180304, at *5-*6. In evaluating a claimant's statements regarding his or her symptoms, the ALJ must consider "all of the relevant evidence," including: the claimant's history; objective medical findings obtained from medically acceptable clinical and laboratory diagnostic techniques; statements from the claimant, treating sources, and non-treating sources; and any other evidence relevant to the claimant's symptoms, such as, evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and other factors relating to functional limitations and restrictions due to the claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(1)-(3), 416.929(c)(1)-(3); *see also Craig*, 76 F.3d at 595; SSR 16-3p, 2017 WL 5180304, at *4-*7.

SSR 16-3p provides further instruction on what type of evidence should be considered when the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence. SSR 16-3p, 2017 WL 5180304, at *6. The ruling presents an extensive list of evidence that may prove probative and notes that valuable evidence to consider may include (1) a longitudinal record of any treatment and its success or failure, including any side effects of medication and (2) indications of other impairments, such as potential mental impairments, that could account for an individual's allegations. *Id.*

In *Hines v. Barnhart*, the Fourth Circuit stated that:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). The ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations; however, the lack of objective medical evidence may be one factor considered by the ALJ. SSR 16-3p, 2017 WL 5180304, at *5.

Ultimately, "it is not sufficient for [an ALJ] to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.' It is also not enough for [an ALJ] simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the [ALJ] evaluated the individual's symptoms." *Id.* at *9. SSR 16-3p instructs that "[t]he focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person;" rather, the core of an ALJ's inquiry is "whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities." *Id.* at *10.

When considering whether an ALJ's evaluation of a claimant's reported symptoms is supported by substantial evidence, the Court does not replace its own assessment for

that of the ALJ; rather, the Court scrutinizes the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to the weight to be afforded to a claimant's report of symptoms, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

Here, the ALJ did not properly perform the two-step process. After considering the evidence, the ALJ concluded that Claimant's medically determinable impairments could reasonably be expected to cause his alleged symptoms. (Tr. at 5206). The ALJ mentioned Claimant's testimony that he was homebound due to immunosuppressive medications in her summary of Claimant's subjective symptoms. (*Id*.). However, the ALJ found that Claimant's statements concerning the intensity, persistence, and limiting effects of the symptoms were "not entirely consistent with the medical evidence and other evidence in the record." (*Id*.). At this point, the ALJ did not articulate any explanation as to how Claimant's vasculitis symptoms or treatment for vasculitis factored into the subjective symptoms analysis and Claimant's RFC. (Tr. at 5206).

The ALJ's findings at step two of the sequential evaluation provide helpful insight into the ALJ's reasoning regarding that condition. The ALJ noted that Claimant was diagnosed with leuokytoclastic vasculitis in April 2020 and began treatment, which included steroids. (Tr. at 5202). However, the ALJ stated that there were no findings of lower extremity abnormalities due to vasculitis upon examination in January 2021. (*Id*.). Thus, the ALJ adjudged that Claimant's vasculitis and related symptoms resolved within

12 months of onset and were non-severe. (*Id*.). As previously discussed, this reasoning is flawed. The January 2021 record is a telehealth visit. Claimant was not examined at that time. (Tr. at 7315).

It is clear that the ALJ likewise dismissed Claimant's vasculitis in the subjective symptom and RFC analysis. The ALJ provided no indication that she considered the fact that Claimant suffered from vasculitis and was on long term immunosuppressive treatment. Other than citing Claimant's complaints, she does not articulate any discussion regarding how she reconciled or applied that information in the RFC finding. Moreover, the ALJ's finding is not supported by substantial evidence because it is based on an unreasonable analysis of the evidence. The ALJ incorrectly cited a 2021 cardiology telehealth appointment as standing for the proposition that Claimant did not have any lower extremity abnormalities on examination.

The ALJ was required to consider relevant evidence relating to Claimant's symptoms such as treating source statements, medication and resulting side effects, and other factors relating to functional limitations and restrictions due to the claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(1)-(3), 416.929(c)(1)-(3); *see also Craig*, 76 F.3d at 595; SSR 16-3p, 2017 WL 5180304, at *4-*7. The ALJ clearly failed to do so regarding Claimant's vasculitis. Therefore, the undersigned **FINDS** that the ALJ's evaluation of the Claimant's subjective symptoms is not supported by substantial evidence and the matter should be remanded on this additional basis for the ALJ to reconsider or elaborate upon her analysis of Claimant's vasculitis.

### D. Function-by-Function Analysis

In his final challenge, Claimant argues that the ALJ failed to perform a function-by-function analysis and instead expressed her RFC conclusion first and cited evidence

36

that supported it. SSR 96-8p provides guidance on how to properly assess a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1. RFC is a measurement of the **_most_** that a claimant can do despite his or her limitations resulting from both severe and non-severe impairments, and the finding is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id.*

According to SSR 96-8p, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3. The functions which the ALJ must assess include a claimant's physical abilities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching); mental abilities, such as understanding, remembering, and carrying out instructions and responding appropriately to supervision, coworkers, and work pressures in a work setting; and other abilities, such as seeing and hearing. 20 CFR §§ 404.1545(b)-(d), 416.945(b)-(d)

Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." SSR 96-8p, 1996 WL 374184, at *3. Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges

and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id.* at *4. In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at *7.

While an ALJ is not required to explicitly discuss "irrelevant or uncontested" functions, "[r]emand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)) (markings omitted).

In this case, Claimant does not identify any other specific evidence or functional abilities that the ALJ overlooked, and no other errors are apparent from the decision. The undersigned **FINDS** that Claimant does not identify any further errors in the ALJ's decision that must be considered on remand.

## VIII.  Recommendations for Disposition

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **GRANT** Plaintiff's request for judgment on the pleadings, (ECF No. 9), to the extent that it requests remand of the Commissioner's decision; **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 10); **REVERSE** the final decision of the Commissioner;

**REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this PF&R; and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Judge and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** November 15, 2022

Cheryl A. Eifert
United States Magistrate Judge